**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **ARTHUR F. FLETCHER**, | : | Case No. 1:14CV00595 |
| Plaintiff, | : | |
| vs. | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| **CAROLYN COLVIN**, | : | |
| **ACTING COMMISSION OF SOCIAL SECURITY**, | : | |
| | : | |
| Defendant. | : | |

**I. INTRODUCTION.**

In accordance with the provisions of Rule 72.2 of Local Rules for the United States District Court, Northern District of Ohio, this case was automatically referred to the undersigned Magistrate Judge to conduct any and all proceedings in this case. Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of Defendant's final determination denying his claims for Disability Insurance Benefits (DIB) made pursuant to Title II of the Social Security Act (Act)[1] and Supplemental Security Income (SSI) under Title XVI of the Act[2]. Pending are the Briefs of the parties (Docket Nos. 13 &

---

[1] In order to receive DIB, the claimant must show that he or she was rendered disabled on or before the expiration of their insured status. 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1) (Thomson Reuters 2014).

[2] SSI is a supplemental program of last resort for people with no other source of income. 42. U.S.C. § 1382 (Thomson Reuters 2014). Under SSI, there is no period of time during which a claimant must be insured. *See* 20 C.F.R. §§ 416.202, 416.203(b), 416.335 (Thomson Reuters 2014).

15) and Plaintiff's Reply Brief (Docket No. 16).  For the reasons that follow, the Magistrate Judge recommends that the Court affirm the Commissioner's decision.

## II. PROCEDURAL BACKGROUND.

Plaintiff applied for DIB and SSI on June 7, 2011, alleging that his disability began on November 1, 2007 (Docket No. 12, pp. 184-186, 188-192 of 402).  The application for DIB was denied initially on November 9, 2011 (Docket No. 12, pp. 110-112, 113-115 of 402) and upon reconsideration on February 10, 2012 (Docket No. 12, pp. 121-123, 125-127 of 402).  ALJ Alfred V. Lucas conducted an administrative hearing on October 10, 2012, at which Plaintiff, his counsel, Vocational Expert (VE) Brad Sulkin appeared and testified (Docket No. 12, p. 35 of 402).  During the hearing, the request of Plaintiff's counsel to amend the disability onset date to March 1, 2011 was granted (Docket No. 12, p. 62 of 402).  On December 27, 2012, ALJ Lucas issued an unfavorable decision (Docket No. 12, pp. 19-30 of 402).  On February 19, 2014, the Appeals Council denied Plaintiff's request for review (Docket No. 12, pp. 5-7 of 402).

.  ## III. FACTUAL BACKGROUND.

### A. PLAINTIFF'S TESTIMONY.

Plaintiff was 51 years of age,  5'9" tall and weighed 160 pounds.  After withdrawing from high school, Plaintiff enrolled in a vocational course and was awarded a diploma as a building/stationary engineer (Docket No. 12, pp. 38, 39 of 402).  He lived alone in several rooms of a  house that was under repair.  Plaintiff owned a car which he drove  twice weekly (Docket No. 12, pp. 38-39 of 402).

Plaintiff last worked in 2007 as a building maintenance engineer.  In that capacity, he gutted, upgraded and made structural and cosmetic repairs to housing units.  During the course of his job duties, Plaintiff removed damaged appliances and carpeting from residences.  It was not unusual for

Plaintiff to push and/or roll a cart loaded with up to 300 pounds of debris, furniture, carpet or appliances to the dumpster (Docket No. 12, pp. 40, 41, 42, 43 of 402).

Dr. Billy L. Brown, M.D., an internal medicine specialist, treated Plaintiff for chronic and severe lower back pain by prescribing a drug regimen, physical therapy and pain management therapy. The drug regimen included prescriptions for Percocet, Ibuprofen and a muscle relaxer. Plaintiff claimed that the side effects caused him to feel "yucky." The physical therapy regimen included home and clinical exercises. Plaintiff was scheduled to resume pain management therapy (Docket No. 12, pp. 43, 44, 45, 46, 47 of 402; www.healthgrades.com/physician/dr-billy-brown).

Plaintiff also had medium to severe neck pain most of the day. While the back pain radiated to both legs, more on the left, and feet, resulting in numbness and pain, the neck pain was typically more severe with movement. Pain radiated through his arms to his fingers, more severe on the left (Docket No. 12, pp. 47-48 of 402). Overall, Plaintiff's pain was exacerbated by precipitation (Docket No. 12, p. 57 of 402).

Even with his maladies, Plaintiff could grasp and manipulate with his left hand, bend at his waist and lift up to ten pounds (Docket No. 12, pp. 49-50, 55 of 402). He could stand for two hours before experiencing throbbing pain and walk "four sides of a small block" and sit for up to two hours (Docket No. 12, pp. 53-54 of 402). Plaintiff had difficulty ascending stairs when he did not position his left leg far enough up the stair (Docket No. 12, p. 54 of 402). Plaintiff could squat down bending at the knees (Docket No. 12, p. 56 of 402).

Plaintiff could feed and dress himself (Docket No. 12, p. 59 of 402). He did not cook daily; rather, he heated his meals or ate sandwiches. Occasionally he would bake a chicken (Docket No. 12, p. 58 of 401). Plaintiff did very minimal house cleaning; however, he did not wash dishes or do laundry (Docket No. 12, p. 59 of 402). Plaintiff watched television and read "a little" (Docket No.

3

12, p. 60 of 402).

**2. VE TESTIMONY**

The VE categorized Plaintiff's maintenance technician job as a maintenance engineer described at 382.664-010 in DICTIONARY OF OCCUPATIONAL TITLES (DOT), a compilation of data and definitions in selected industries that provides the best "snapshot" of how jobs are performed in the majority of industries across the country. According to the VE, this semi-skilled occupation was classified as medium work which carried a specific vocational preparation of three. The level time of three denotes that the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in the maintenance engineer position would be more than one month and up to and including six months (Docket No. 12, p. 65 of 402; www.occupationalinfor.org.).

A.   **THE ALJ'S INQUIRY:**

The ALJ posed the *first* hypothetical question:

Assume an individual of Plaintiff's age, education and work background, who was impaired to the extent that Plaintiff described. Would there be any jobs which exist in significant numbers in the economy that Plaintiff could perform?

The VE responded that there were no jobs that Plaintiff could perform (Docket No. 12, pp. 65-66 of 402).

The ALJ posed a *second* hypothetical question:

Assume a person of the same age, education and work background and that this person is capable of a certain range of "leg" work. Assume that he'd be limited to only occasional climbing of ramps or stairs. No climbing of ladders, ropes, or scaffolds or working at unprotected heights. Only occasional stooping, occasional crawling. With those limitations, would there be any jobs which exist in significant numbers that this person could do?

According to the VE, at the light level, there were three jobs, all of which are unskilled and

require specific vocational preparation of anything beyond a short demonstration up to and including one month, available in the five-county Metro Cleveland (MC) area, Ohio and the national economy, as follows:

| POSITION/DOT | MC | OHIO | NATIONAL ECONOMY |
|---|---|---|---|
| CASHIER/211.462-010 | 4,900 | 29,000 | 816,000 |
| SALES ATTENDANT/299.677-010 | 1,300 | 6,900 | 193,000 |
| FAST FOOD WORKER/311.472-010 | 9,200 | 57,000 | 1,000,000 |

(Docket No. 12, pp. 66-67 of 402).

The ALJ posed a *third* hypothetical:

Assume that re-discussing a person of the same age, education and work background. This person is capable of standing in the work place for six hours out of an eight-hour workday, without interruption, two hours. He has no difficulty in sitting. So that he could lift 25 pounds occasionally and 10 pounds frequently. Assume that this person would be limited to occasional balancing and stooping but would not be able to climb, crouch, kneel or crawl. Assume that this person would be limited to occasional reaching, pushing and pulling. He would be unable to perform work at unprotected heights, or around moving machinery or ladders, ropes and scaffolds. With those limitations, would there be jobs in the national economy that this person could do?

According to the VE, at the light level, there were three jobs, all of which are unskilled and require specific vocational preparation of anything beyond a short demonstration up to and including one month, available in the five-county MC area, Ohio and the national economy, as follows:

| POSITION/DOT | MC | OHIO | NATIONAL ECONOMY |
|---|---|---|---|
| SCHOOL BUS MONITOR/372.667-042 | 200 | 600 | 45,000 |
| FLAGGER | 14 | 50 | 1,030 |
| WATCH GUARD/372.667-030 | 1,000 | 3,700 | 127,000 |

(Docket No. 12, pp. 67-68 of 402).

  B.   COUNSEL'S INQUIRY.

5

In response to counsel's inquiry, the VE explained that if the hypothetical person was off task 20% of the time, he or she would not be able to sustain work at these jobs. Furthermore, if the hypothetical person was absent four days per month, he or she would not have a job (Docket No. 12, p. 68 of 402).

> With respect to the ALJ's third hypothetical, counsel asked the VE to consider that if after two hours of standing, the hypothetical person had to sit for ½ hour before getting up, would there be a change to jobs?

The VE stated that the jobs cited for hypothetical number three could be performed with the exception of the flagger (Docket No. 12, pp. 68, 69, 70 of 402).

### IV. MEDICAL EVIDENCE.

Plaintiff presented to Northwest Ohio Neighborhood Health Services (NEON) on October 7, 2008, with complaints of leg pain and a cramp in his foot on March 15, 2010 (Docket No. 12, p. 261 of 402); on March 15, 2010, with complains of stomach pain and diarrhea (Docket No. 12, pp. 254-255 of 402); and on November 18, 2010, with complaints of sinus infection identified previously by Plaintiff's dentist (Docket No. 12, pp. 252-253 of 402).

On February 22, 2010, Plaintiff was involved in a motor vehicle accident. He arrived at the Cleveland Clinic complaining of neck and back pain. The results from diagnostic tests showed:

1. Normal paraspinal soft tissues with no masses.
2. Normal cervical spine.
3. No abnormal pulmonary disease.
4. Unremarkable pelvis.
5. Abnormal red blood count.
6. The percentage of fluid that circulated throughout the lymphatic system was elevated.
7. The absolute lymphocyte percentage was elevated.

(Docket No. 12, pp. 349-362 of 402).

Plaintiff presented to Dr. Raphael S. Chung, M.D., a general surgeon, on March 23, 2010,

with complaints of hand numbness and tingling. Upon identifying Plaintiff's problems as nerve injury in the left wrist, Dr. Chung explained that there was no surgical intervention for this type of nerve injury (Docket No. 12, pp. 341-342 of 402; www.healthgrades.com/physician/dr-raphael-chung).

On April 2, 2010 and June 4, 2010, Dr. Brown treated Plaintiff for chronic low back pain arising from an automobile accident on February 22, 2010. The pain was severe and Dr. Brown prescribed a nonsteroidal anti-inflammatory drug (NSAID), bed rest and the application of warm, moist heat three times daily. Dr. Brown supplemented the treatment regimen with Chantix®, a prescription medicine used to treat nicotine addiction (Docket No. 12, pp. 335-337, 338-340 of 402).

The three views of Plaintiff's cervical spine taken on April 21, 2010, showed no fracture or partial or incomplete dislocation (Docket No. 12, p. 343 of 402).

On July 13, 2010, Dr. Brown diagnosed Plaintiff with inflammation of the tendon in the elbow for which a topical cream used primarily to treat minor aches and muscle pain was prescribed (Docket No. 12, pp. 332-334 of 402).

Plaintiff recalled that on or about November 1, 2010, he started experiencing aching pain to his head that lasted up to nine hours daily. On December 1, 2010, Dr. Sanford M. Timen, M.D., an otolaryngologist, conducted an endoscopy and a nasopharyngoscopy, the results of which failed to show abnormal results. Consequently, Dr. Timen considered the headaches a long-term outcome of the motor vehicle accident injury sustained on February 22, 2010 (Docket No. 12, pp. 324-328 of 402).

Dr. Brown diagnosed Plaintiff with mechanical low back pain on November 30, 2010. He prescribed a NSAID and bed rest (Docket No. 12, pp. 328-331 of 402).

On December 28, 2010, Plaintiff presented with complaints of left shoulder and arm pain.

Although the radiographic evidence showed anatomical alignment of the osseous structures in the humerus and no evidence of fracture, Dr. Brown administered an injection of Depo-Medrol, an anti-inflammatory glucocorticoid used for intramuscular, intra-articular soft tissue or intra-lesional injection (Docket No. 12, pp. 320-322, 346 of 402; http://www.drugs.com/pro/depo-medrol.html).

On February 28, 2011, Dr. Brown continued the cocktail of medications which included pain relievers, anti-inflammatory medications, an anti-nausea medication and a nasal spray. This group of medications was used to resolve Plaintiff's low back, left shoulder pain and sinus inflammation (Docket No. 12, pp. 317-320 of 402).

On March 2, 2011, Plaintiff underwent a magnetic resonance imaging of the lumbar spine. The results were:

1. Mild endplate inflammatory edema with associated broad based posterior protrusion at L5-S1 and foraminal narrowing greatest at L5-S1.
2. No significant central narrowing (Docket No. 12, pp. 272-274 of 402).

Plaintiff presented to Dr. Brown on March 28, 2011, complaining of low back pain radiating to the left leg and left shoulder pain. Dr. Brown authorized refills of Plaintiff's medications and his office coordinated a consultation at Community Orthopedics (Docket No. 12, pp. 313-316 of 402).

On April 14, 2011, Plaintiff complained of more severe and frequent multiple joint pain and Dr. Smith conducted an examination of the lumbar spine, extremities and shoulder. Plaintiff was prescribed medication to resolve the pain and inflammation. Dr. Smith recommended that Plaintiff continue physical therapy (Docket No. 12, pp. 307-309, 311- of 402).

The diagnostic tests administered on Plaintiff's cervical spine showed no fracture or partial or incomplete dislocation. In fact, the "vertebral bodies facets" were anatomically aligned on April 21, 2011 (Docket No. 12, pp. 270-271 of 402).

Dr. Brown diagnosed Plaintiff with inflammation of the bursae in the left shoulder on May

16, 2011. The treatment plan incorporated physical therapy and administering an injection of Toradol, a medication used to treat pain and inflammation (Docket No. 12, pp. 301-304 of 402).

Plaintiff presented to the University Hospitals of Cleveland Emergency Room on May 21, 2011, complaining of back pain that radiated down his left leg, back spasm, left leg spasm, left leg pain and numbness and herniated disk (Docket No. 12, pp. 394, 396 of 402). Plaintiff was diagnosed with neck strain generally caused by injury to the muscles or ligaments in the spine. He was discharged with narcotic medication (Docket No. 12, pp. 276-278, 391, 393 of 402).

On June 6, 2011, Plaintiff stopped taking Prednisone, noting that it caused nausea (Docket No. 12, pp. 297, 298-301 of 402).

On July 1, 2011, Dr. Howard Smith, M.D., a specialist in rheumatologic and immunologic disease, diagnosed Plaintiff with lumbago, sprain in the lumbar region, sciatica and tobacco abuse. He considered Plaintiff's condition stable on the current medication but he urged Plaintiff to quit smoking. In addition, Dr. Smith ordered a physical therapy consultation (Docket No. 12, pp. 293-295 of 402; www.clevelandclinic.org/staff_directory/staff).

On August 1, 2011, Plaintiff complained to Dr. Brown about back pain radiating down his left leg. In addition to the medication, Dr. Brown recommended that Plaintiff undergo a physical therapy consultation (Docket No. 12, pp. 279-285 of 402).

Dr. William C. Burgette, D.O., a specialist in orthopedic surgery, conducted a follow-up review of Plaintiff's left lower extremity pain, numbness, neck pain and sciatica on July 14, 2011. Plaintiff was prescribed Oxycodone-acetaminophen and a Medrol pack (Docket No. 12, pp. 291-292 of 402; www.healthgrades.com/physician/dr-william-burgette).

On August 5, 2011, a re-evaluation for physical therapy authorized by Dr. Smith was conducted. Based on Plaintiff's diagnoses of sprain of the lumbar region, lumbago, sciatica and

9

cervicalgia, physical therapist Lisa Niro performed therapeutic exercises, conducted transfer training and educated Plaintiff about home exercises (Docket No. 12, pp. 279-283 of 402).

Dr. Adi A. Gerblich, M.D., a critical care medicine specialist, conducted a disability evaluation on September 28, 2011, and confirmed that Plaintiff had degenerative disc disease, a limited range of motion primary in the cervical spine and no apparent limitation for sedentary activity (Docket No. 12, pp. 363-365 of 402). Moreover, Dr. Gerblich found that:

1. Plaintiff had a limited range of motion in the dorsolumbar spine and the cervical spine.
2. Plaintiff had a full range of motion in the ankles, elbows, fingers, hands, hips, knees, shoulders and wrists.
3. Plaintiff could raise his elbows, feet, fingers, hips, knees, shoulders and wrists against maximal resistance.
4. Plaintiff's ability to grasp, manipulate and pinch was normal bilaterally.

(Docket No. 12, pp. 365-368 of 402; www.healthgrades.com/physician/dr-adi-gerblich).

On July 20, 2012, Dr. Brown concluded that Plaintiff should consult with orthopedic, neurology and pain management specialists (Docket No. 12, pp. 382-386 of 402).

By August 10, 2012, Plaintiff had undergone three of twelve visits at the Cleveland Clinic Rehabilitation and Sports Therapy Physical Department. The plan was to decrease the intensity of pain and therefore, improve Plaintiff's strength, gait and posture (Docket No. 12, pp. 369-372, 373-381 of 402).

Finally, on September 21, 2012, Dr. Brown made the following findings:

1. Plaintiff's low back pain affected his ability to lift and/or carry more than 25 pounds.
2. Plaintiff could stand and/or walk six hours, two without interruption.
3. Plaintiff's ability to sit was not affected by his impairments.
4. Plaintiff could never climb, crouch, kneel or crawl.
5. Plaintiff's ability to reach and push/pull was affected by his impairments.
6. Plaintiff would be off task between 17.5% of the day and it was likely that he would be absent four days per month (Docket No. 12, pp. 387-389 of 402).

### THE SOCIAL SECURITY ADMINISTRATION'S REVIEW.

To be eligible for Disability Insurance Benefits (DIB) or Supplemental Security Income (SSI) a claimant must be under a "disability" within the definition of the Social Security Act. *Winkle v. Colvin,* 2014 WL 4426255, \*5 (S.D.Ohio,2014) (*citing* 42 U.S.C. §§ 423(a), (d), 1382c(a)). The definition of the term "disability" is essentially the same for both DIB and SSI. *Id.* (*See Bowen v. City of New York*, 106 S.Ct. 2022, 2024-2025 (1986)). A "disability" consists only of physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *Id.* (*See Bowen*, 106 S.Ct. at 2024-2025). In addition, the impairment must "be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423).

When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step analysis set forth in 20 C.F.R. §§ 404.1520, 416.920. *Ealy v. Commissioner of Social Security*, 594 F.3d 504, 512 (6th Cir. 2010).

> First, a claimant must demonstrate that he or she is not currently engaged in substantial gainful employment at the time of the disability application. *Id.* (*citing* 20 C.F.R. § 404.1520(b)). Second, the claimant must show that he or she suffers from a severe impairment. *Id.* (*citing* 20 C.F.R. § 404.1520(c)). Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months, which meets or equals a listed impairment, he or she will be considered disabled without regard to age, education, and work experience. *Id.* (*citing* 20 C.F.R. § 404.1520(d)). Fourth, if the Commissioner cannot make a determination of disability based on medical evaluations and current work activity and the claimant has a severe impairment, the Commissioner will then review claimant's residual functional capacity (RFC) and relevant past work to determine if he or she can do past work; if so, he or she is not disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(e); *Howard v. Commissioner of Social Security*, 276 F.3d 235, 238 (6th Cir.2002)). If the claimant's impairment prevents him or her from doing past work, the analysis proceeds to the fifth step where the Commissioner will consider the claimant's RFC, age, education and past work experience to determine if he or she can perform other work. *Id.* If the claimant cannot perform other work, the Commissioner will find him or her disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(f)).

## V. SUMMARY OF THE ALJ'S DECISION.

Using the sequential five-step analysis, the ALJ made the following findings of fact and conclusions of law.

1. Plaintiff met the insured status requirements of the Act through March 31, 2011.

2. Plaintiff had not engaged in substantial gainful activity since March 1, 2011, the alleged onset date.

3. Plaintiff had the following severe impairments:
    a. Arthritis of the cervical spine.
    b. Arthritis of the lumbar spine.

4. Plaintiff did not have an impairment or combination of impairments which met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff had the residual functional capacity to perform light work except that he could only occasionally climb ramps or stairs but no climbing of ladders, ropes or scaffolds or working at unprotected heights. Plaintiff could occasionally stoop or crawl.

6. Plaintiff was unable to perform any past relevant work.

7. Plaintiff was 49 years old which is defined as a younger individual age 18-49 on the alleged onset date. He subsequently changed age categories to closely approaching advanced age.

8. Plaintiff had at least a high school education and the ability to communicate in English.

9. Considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff was able to perform a significant number of jobs in the national economy (Tr. 20-27).

10. Plaintiff was not under a disability from March 1, 2011, through December 27, 2012 (Docket No. 12, pp. 22-30 of 402).

## VI. DISABILITY STANDARD.

In reviewing the Commissioner's decision, the Magistrate Judge's task is to determine if that

decision is supported by "substantial evidence." *Reynolds v. Commissioner of Social Security,* 2014 WL 1096150, *1 (S.D.Ohio,2014) (*citing* 42 U.S.C. § 405(g)).  The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (*citing Richardson v. Perales*, 91 S.Ct. 1420, 1427 (1971), *citing Consolidated Edison Company v. NLRB*, 59 S.Ct. 206, 216-217 (1938); *Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir.1986)).

   Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (*citing Richardson, supra*, at 1427; *Ellis v. Schweicker*, 739 F.2d 245, 248 (6th Cir.1984)).  Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law) against the Commissioner if this case were being tried to a jury. *Id.* (*citing Foster v. Bowen,* 853 F.2d 483, 486 (6th Cir.1988); *NLRB v. Columbian Enameling and Stamping Company*, 59 S.Ct. 501, 505 (1939)).  To be substantial, the evidence "must do more than create a suspicion of the existence of the fact to be established . . . [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *Id.* (*citing LeMaster v. Secretary of Health and Human Services*, 802 F.2d 839, 840 (6$^{th}$Cir.1986), *quoting NLRB v. Columbian Enameling and Stamping Company, supra*).

   In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Id.* (*citing Hephner v. Mathews*, 574 F.2d 359 (6th Cir.1978); *Ellis, supra*; *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536 (6th Cir.1981); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir.1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir.1984)).  However, the Court may not try the case de novo, resolve conflicts in evidence or decide questions of credibility.  *Id.* (*citing Garner, supra*).  The findings of

13

the Commissioner of Social Security and proceedings on Claimant's application for social security disability benefits are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Id.* (*citing Buxton v. Halter, Commissioner of Social Security*, 246 F.3d 762 (6th Cir.2001)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the Court as a trier of fact would have arrived at a different conclusion. *Id.* (*citing Elkins v. Secretary of Health and Human Services,* 658 F.2d 437, 439 (6th Cir.1981)).

## VII. ANALYSIS.

### 1. PLAINTIFF'S FIRST CLAIM IS THAT THE ALJ FAILED TO FULLY EXPLAIN WHY HE DID NOT GIVE CONTROLLING WEIGHT TO DR. BROWN'S OPINIONS.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. What is most important, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, SSR 96–2p (July 2, 1996). A presumption exists that the opinion of a treating physician is entitled to great deference. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 243 (6th Cir.2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Id*.

If an ALJ decides to discount or reject a treating physician's opinion, he or she must provide "good reasons" for doing so. 1996 WL 374188, at *5. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant

to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore "be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied." *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2nd Cir.1999)).

At a minimum level, the ALJ articulated his analysis of the evidence so that this Court could assess the validity of his findings and provide meaningful review. It is clear that the ALJ recognized that Dr. Brown was a treating source whose opinions regarding Plaintiff's residual functional capacity were given controlling weight. The ALJ found internal inconsistencies within Dr. Brown's reports that were unexplained and not substantiated by the record. For instance, Dr. Brown determined that Plaintiff had at least a residual functional capacity for light work but suggested that Plaintiff would be off task for 20 percent of the time and he would miss four days per month (Docket No. 12, p. 28 of 402). Additionally, Dr. Brown opined that Plaintiff could sit for six hours in an eight-hour workday but later suggested that Plaintiff had postural and environmental limitations that would affect the ability to sit for six hours. Given these inconsistencies, the ALJ elected not to give Dr. Brown's opinion controlling weight in its entirety because it was more restrictive than the assessed residual functional capacity. The ALJ also discounted Dr. Brown's opinion to the extent that it was conclusory, lacking adequate support or reconciliation with his own records which suggest medical improvement (Docket No. 12, p. 28 of 402).

The ALJ's decision reflects that he explicitly acknowledged Dr. Brown's relationship with Plaintiff and then proceeded to provide a comprehensive analysis for the weight assigned to a treating physician's opinion in accordance with the regulations. The Magistrate finds the ALJ's assessment is sufficient. The ALJ committed no legal error when determining how much weight to

15

give treating physician Brown's opinions.

### 2. PLAINTIFF ARGUES THAT THE ALJ ERRED IN NEGLECTING TO CONSIDER WHETHER IT WAS MORE APPROPRIATE TO USE THE HIGHER AGE OR PLAINTIFF'S CHRONOLOGICAL AGE.

At the amended disability onset date, March 1, 2011, Plaintiff was 49 years of age, a younger individual as defined in 20 C.F.R. §§404.1563(c), 416.963(c). When he appeared at the hearing on October 10, 2012, and when the decision was rendered on December 27, 2012, Plaintiff was 51 years of age and appropriately considered a person approaching advanced age as defined in 20 C.F.R. §§ 404.1563(d), 416.963(d). Counsel contends that the ALJ erred in failing to consider that this borderline age situation existed and whether Plaintiff was disabled if using the higher age.

The Medical-Vocational Guidelines, also known as "the Grid" consider the vocational factors of **age**, education, work experience, and residual functional capacity and serves to establish disability by synthesizing these factors. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a) (Thomson Reuters 2014). Under the Grid, age is divided into three categories: younger person (18–49); person closely approaching advanced age (50–54); and person of advanced age (55 and over). 20 C.F.R. §§ 404.1563(c)-(e), 416.963(c)-(e). The Social Security Administration (SSA) has determined that it will not apply the Grid age categories mechanically in a borderline situation. DISABILITY-AGE CRITERION OF THE VOCATIONAL FACTIONS REGULATIONS–USE OF CHRONOLOGICAL AGE-CONSTITUTIONALITY, SSR 82-46c, 1982 WL 31427, *6 (1982). A borderline situation exists when there is a shift in results caused by the passage of a few days or months. *Id.* If a claimant is within a **few days to a few months** of reaching an older age category, and using the older age category would result in a determination or decision that the claimant is disabled, the SSA will consider whether to use the older age category and avoid dramatic shifts in results. 20 C.F.R. §§404.1563(b), 416.963(b)(Thomson Reuters 2014).

16

The undersigned magistrate is not persuaded that Plaintiff fell within the borderline situation considering that at the time of the decision, he was two years beyond the "younger person" threshold. Nevertheless, the ALJ appropriately categorized Plaintiff's status as a person closely approaching advanced age with a residual functional capacity for a limited range of light work, the equivalent of a high school education and previous experience for unskilled work. The ALJ correctly applied the Grid at Step 5, only to find that whether Plaintiff was a younger person or a person closely approaching advanced age, given his level of education, inability to perform past relevant work and other factors significantly limiting his vocational adaptability, he did not have disability status (Docket No. 12, p. 29 of 402; 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 202.14, 202.21). The Magistrate finds that this disability determination represents a reasonable application of Plaintiff's age in the Grid.

### 3. PLAINTIFF ARGUES THAT THE HYPOTHETICAL QUESTION POSED TO THE VE FAILED TO ACCURATELY REFLECT THAT HE WOULD BE ABSENT FOUR TIMES MONTHLY AND OFF TASK 20 PERCENT OF THE WORKDAY.

In order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. *Ealy v. Commissioner of Social Security,* 594 F.3d 504, 516 (6th Cir.2010) (*see Howard v. Commissioner of Social Security*, 276 F.3d 235, 239, 241 (6th Cir.2002); *see also Webb v. Commissioner of Social Security*, 368 F.3d 629, 633 (6th Cir.2004) (though an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with ALJ's assessment of what the claimant "can and cannot do."). The only limitations that need to be included, however, are the ones that the ALJ finds "credible." *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1235 (6th Cir.1993)).

First, Plaintiff argues that because of the severe nature of his back pain and hand pain and


numbness, he will likely sustain far more absences than are tolerable. However, he provides nothing more than conjecture to support his claim. In contrast, the ALJ thoroughly examined the objective medical evidence, none of which suggests that Plaintiff will be excessively absent from work. The ALJ had no duty to account for limitations unsupported by the objective medical evidence in the hypothetical question posed to the VE.

Second, Plaintiff argues that the ALJ erred by not considering that due to his physical impairments, he will be off-task for vastly more than 20 percent of the workday. To support his contention, Plaintiff relies on his own testimony at the hearing corroborated by Dr. Brown's opinion that Plaintiff's ability to perform tasks is greatly diminished due to his pain and the VE opinion that the typical employer would not permit an employee to be off-task 20 percent of the time during an eight-hour work day.

The Magistrate finds Plaintiff's second contention unavailing. The ALJ considered Dr. Brown's opinion that if an employee were off task for 20 percent of the time, full-time employment would not be possible. However, the ALJ fully and thoroughly considered Plaintiff's subjective statements concerning his limitations, and rejected many of them as not entirely credible. Based solely on the finding that this testimony lacked credibility, the ALJ is relieved from including such limitation in the hypothetical posed to the VE. Furthermore, the hypothetical question involving an individual who would be off task 20 percent of the workday lacked materiality. Neither Plaintiff nor his counsel articulated a level of Plaintiff's impairments that would keep him off task 20 percent of the workday.

The Magistrate agrees with the Commissioner. The hypothetical questions to the VE closely tracked the ALJ's assessment of Plaintiff's residual functional capacity and, thus, reasonably incorporated the limitations found by the ALJ to be credible. Having incorporated reasonably all

impairments and functional limitations that were supported by the evidence in the hypothetical questions, the ALJ did not err in failing to include in a hypothetical the possibility that Plaintiff would be absent from work or exceed normal tolerances for downtime at work.

## VIII. CONCLUSION

For the foregoing reasons, it is recommended that the Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate Judge.

/s/ Vernelis K. Armstrong
United Stats Magistrate Judge

Date: October 21, 2014

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.